# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 16-1658V

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | * |
| | * |
| | * |
| GEORGE KOS, | * TO BE PUBLISHED |
| | * |
| Petitioner, | * |
| | * |
| | * Special Master Katherine E. Oler |
| v. | * |
| | * Filed: February 11, 2022 |
| SECRETARY OF HEALTH AND | * |
| HUMAN SERVICES, | * Attorneys' Fees and Costs; Reasonable |
| | * Basis |
| Respondent | * |
| | * |
| * * * * * * * * * * * * * * * * * * * * * * * | * |

*Brian Arnold*, Brian R. Arnold & Associates, Richardson, TX, for Petitioner
*Adriana Teitel*, U.S. Department of Justice, Washington, DC, for Respondent

### DECISION ON FINAL ATTORNEYS' FEES AND COSTS [1]

On December 16, 2016, George Kos ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program,[2] alleging that he developed symptoms including weakness and numbness, "headaches, nausea, postural tachycardia, palpitations blurred vision, dizziness, malaise, fatigue, muscle and joint pain, abdominal pain, severe weight loss, chest pain, loss of breath, pain in his rib cage, anxiety, depression, excess sleepiness, shaking and twitches, etc.," from the Tdap vaccination he received on December 20, 2013. Pet. at 1, ECF No. 1.

---

[1] This Decision has been formally designated "to be published," thus it will be posted on the Court of Federal Claims website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet**. As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

On September 18, 2020, Petitioner filed a Motion to Voluntarily Dismiss pursuant to Rule 21(a). ECF No. 78. On September 21, 2020, I issued a decision dismissing the petition. ECF No. 79.

On April 21, 2021, Petitioner filed a motion for attorneys' fees and costs (hereinafter Petitioner's application for fees or "Fees App.") requesting a total of $122,593.26. Fees App., ECF No. 84. On May 19, 2021, Respondent filed a response to Petitioner's application (hereinafter Fees Response or "Fees Resp."), stating

> the filed medical records fail to support petitioner's apparent alleged vaccine injury of chronic fatigue syndrome and/or MMF. Additionally, petitioner has provided no evidence of [a] reputable causation theory or addressed what a medically appropriate timeframe for vaccine injury would be under his theory. Based on the objective evidence in the case record, petitioner has not established a reasonable basis exists for his claim.

Fees Resp. at 10-11, ECF No. 86. On May 26, 2021, Petitioner filed a reply reiterating his belief that the petition was filed in good faith and with a reasonable basis. Fees Rep., ECF No. 87.

For the reasons set forth below, I hereby **GRANT IN PART** Petitioner's application for attorneys' fees and costs and award a total of **$55,382.49**.

## I.     Procedural History

Petitioner filed his petition on December 16, 2016. ECF No. 1. Petitioner filed numerous records from 2017-18 and filed a Statement of Completion on January 4, 2018. Exs. 1-14, ECF Nos. 12, 13, 30-32.

On April 16, 2018, Respondent filed a Rule 4(c) Report stating this case is not appropriate for compensation. Resp't's Rep. at 1, ECF No. 39. Specifically, Respondent stated "The evidence does not support a Table injury, and Petitioner has failed to establish he suffered a vaccine injury or prove any causal link between the Tdap vaccination he received on December 20, 2013 and his conglomerate of symptoms." *Id.* at 13.

On October 23, 2018, Petitioner filed an expert report written by Ava Stanczak, D.O. Ex. 15. Petitioner filed additional medical records on 4//24/2019, 7/30/2019, 8/14/2019, and 11/5/2019. ECF Nos. 48, 50, 51, 55.

On November 22, 2019, Respondent filed an expert report written by Dr. J. Lindsay Whitton and a Motion for Order to Show Cause. Ex. A; ECF No. 58. On December 4, 2019, I held a status conference with the parties to discuss Petitioner's theory of causation. *See* Scheduling Order dated 12/4/2019, ECF No. 59. On February 3, 2020, Petitioner filed a status report stating he wished to proceed with his case and intended to file a response to Respondent's Motion for Order to Show Cause. ECF No. 62.

On March 4, 2020, Petitioner filed a response to Respondent's motion. ECF No. 64. On March 25, 2020, Respondent filed a reply to his motion. ECF No. 66. On March 31, 2020, I held

another status conference with the parties. *See* Minute Entry dated 3/31/2020; Scheduling Order dated 4/2/2020, ECF No. 72. During this status conference, I informed Petitioner's counsel that the record was insufficient for Petitioner to demonstrate by preponderant evidence that he has satisfied any of the *Althen* prongs. *See* Scheduling Order dated 4/2/2020, ECF No. 72. I encouraged Petitioner's counsel to speak with his client about dismissing his petition and preserving his right to pursue a civil action. *See id.* I granted Petitioner 30 days to file a status report indicating how he would like to proceed. *See id.*

Petitioner filed status reports on 4/30/2020, 6/30/2020, 8/3/2020, 9/9/2020 providing updates on his search for a new expert and an alternate theory of causation. ECF Nos. 73-76. On September 14, 2020, I held another status conference with the parties. *See* Minute Entry dated 9/14/2020; *see also* Scheduling Order dated 9/14/2020, ECF No. 77. Petitioner's counsel stated he was able to contact his client shortly before the conference and consented to having his case dismissed. *See* Scheduling Order dated 9/14/2020, ECF No. 77.

On September 18, 2020, Petitioner filed a motion to dismiss his petition. ECF No. 78. On September 21, 2020, I granted that motion and issued a decision dismissing the petition. ECF No. 79.

On April 21, 2021, Petitioner filed a motion for attorneys' fees and costs (hereinafter Fees Application or "Fees App."). Fees App., ECF No. 84. Respondent filed a response to Petitioner's motion on May 19, 2021 contesting reasonable basis (hereinafter Fees Response or "Fees Resp."). Fees Resp., ECF No. 86. On May 26, 2021, Petitioner filed a reply. Fees Reply, ECF No. 87.

This matter is now ripe for adjudication.

## II.    Petitioner's Relevant Medical History

On December 3, 2013, Petitioner contacted Kaiser Permanente reporting he had experienced two weeks of bilateral hand pain with numbness, tingling, and swelling, which affected his ability to sleep. Ex. 2 at 106. Petitioner was seen by Dr. Younessi the next day. *Id.* at 121. Petitioner had a medical history of temporomandibular joint dysfunction, shoulder regional pain, and gastritis. *Id.* Dr. Younessi performed a physical exam and discovered tenderness over both lateral epicondyles, and referred Petitioner to physical therapy. *Id.* Dr. Younessi's assessment was that Petitioner had tendinitis in both elbows. *Id.* at 122. Petitioner refused the flu and Tdap vaccines during this visit, stating that he was not feeling well. *Id.* at 123.

On December 10, 2013, Petitioner underwent a physical therapy evaluation for bilateral elbow tendonitis, with a history of shoulder joint pain. Ex. 2 at 143-44. Petitioner was scheduled for appointments on 12/31, 1/9, 1/27, 1/29 but never returned to the clinic and was discharged. *Id.* at 146.

On December 20, 2013, Petitioner presented to the emergency room with lacerations on his nose and right eyebrow after falling over a shopping cart. Ex. 2 at 165. Petitioner received four sutures on his eyebrow and a Tdap vaccine. *Id.* at 170-71, 178.

On December 30, 2013, Petitioner sent an email to Dr. Younessi stating that since 12/25/2013, his right arm had been painful at the injection site, that he was extremely tired, and that he experienced a stiff neck and pain in his neck and shoulder. Ex. 2 at 201. Petitioner stated he felt like he had the flu without the fever. *Id.* On the next day, RN Irene Hart emailed Petitioner back stating, "your symptoms are side effects from the tdap vaccine. Rest, drink extra fluids and Tylenol will help the body aches." *Id.* at 211. On January 2, 2014, Petitioner emailed back stating "Thank you for the helpful info. How long [does] it usually takes [sic] before these symptoms subsside[?] I am due back to work Jan 2. *Id.* Ms. Hart responded that Petitioner would be feeling better by January 2. *Id.*

On January 2, 2014, Petitioner again emailed Ms. Hart stating that he woke up "nauseated, same as the days before…can you please get me [a Doctor's note] for my employer?" Ex. 2 at 206. Ms. Hart entered a message in the system stating "the patient has had flu like symptoms after receiving the immunization tdap on 12/20/13. He is requesting to have a note to be off work for today." *Id.* at 217. Dr. Younessi signed a note that same day diagnosing Petitioner with viral syndrome. *Id.* at 204.

Petitioner again asked for a note on January 3, 2014 (Friday), and again on January 6, 2014 (Monday). Ex. 2 at 215. In requesting the note from Dr. Younessi, Ms. Hart stated that Petitioner developed "flu like symptoms" from the Tdap vaccine on both January 3 and January 6. *Id.*

Petitioner continued sending Dr. Younessi emails in January 2014, noting nausea, low energy, weakness, and muscle spasms, and requested notes to be excused from work. *Id.* at 202-300. On January 13, 2014, Petitioner spoke with a nurse at Kaiser and stated "I think it's viral related and feeling betters [sic] but wasn't sure if I should arrange to see my doctor for follow up mild weakness." *Id.* at 276.

On January 21, 2014, Petitioner met with Dr. Bill Tu with a chief complaint of spasms as well as three weeks of dizziness and flu-like symptoms. Ex. 2 at 305-06. Dr. Tu diagnosed Petitioner with a viral syndrome and possible cervical vertigo. *Id.* at 307.

On January 28, 2014, Petitioner visited Dr. Younessi who noted that Petitioner suffered a "mechanical fall" and experienced disequilibrium especially while driving, generalized weakness, and low energy. Ex. 2 at 372. Petitioner underwent an x-ray where a 3mm retrolisthesis of C5 on C6 was discovered, clinical significance was uncertain. *Id.* at 376. Dr. Younessi informed Petitioner that his blood work was normal on the following day.

On February 25, 2014, Petitioner visited Dr. Amir Khoiny for a neurological exam concerning complaints of disequilibrium and dizziness. Ex. 2 at 474. Dr. Khoiny's assessment was that Petitioner has postural orthostatic tachycardia syndrome ("POTS"), though he also noted Petitioner "does not have enough other symptoms of post-concussion to currently give that dxn in my opinion" and he "cannot rule out other psychological co-morbidities as well." *Id.* at 476. Dr. Khoiny recommended a brain MRI and beta-blocker, SSRI or midodrine if his symptoms continue. *Id.*

On March 7, 2014, Petitioner had an abdominal ultrasound which was normal. Ex. 2 at 479-80. On March 10, 2014, Petitioner underwent a brain MRI, which was also normal. *Id.* at 477-78.

On March 25, 2014, Petitioner had a follow-up appointment with Dr. Khoiny reporting he was still experiencing dizziness and insomnia. Ex. 2 at 622. Dr. Khoiny prescribed Effexor for his symptoms (which Dr. Khoiny noted could be psychosomatic or anxiety related) and a Vitamin B12 injection. *Id.* at 624. In a follow-up email the next day, Petitioner asked whether the Tdap vaccination could have caused his symptoms; Dr. Khoiny stated he could not say whether it was related to a vaccine but that it was "probably unlikely." *Id.* at 650. Dr. Khoiny suggested to Petitioner that if he believed it was vaccine related, he should report it to VAERS. *Id.* Petitioner responded that he did not yet want to submit a VAERS report because he was "not sure if it was caused by the vaccine or by something else." *Id.*

On April 1, 2014, Petitioner returned to Dr. Younessi to follow-up and received another work disability note. Ex. 2 at 679. Dr. Younessi's assessment was that Petitioner had POTS and an anxiety disorder. *Id.* at 681.

On April 28, 2014, Petitioner returned to Dr. Younessi and noted Petitioner had improvements regarding his mood with Effexor and requested to be tested for mold exposure. Ex. 2 at 715-17. Those tests came back as normal. *Id.* at 719-20.

On June 24, 2014, Petitioner presented to Dr. Mitchell Danesh, a neurologist, to follow-up for POTS and reported he felt worse with venlafaxine (Effexor), got tired from eating, and got dizzy from consuming fatty foods. Ex. 2 at 797-98. Petitioner was sleeping better and no longer took Clonazepam. *Id.* Dr. Danesh referred Petitioner to gastroenterology for abdominal pain and bloating. *Id.* at 800. Petitioner was tested for Lyme disease, which wOas negative. *Id.* at 802.

On July 3, 2014, Petitioner sent an email to Dr. Lee stating, in part, that Dr. Lee had "mentioned that my current condition may be caused by the administration of the vaccine Adacel which I received on December 20th[, 2013]." Ex. 2 at 871. In a follow up email sent on July 10, 2014, Petitioner stated "Yesterday [Dr. Lee] noted that there is no serial # of the vaccine" and therefore it would be impossible to trace the specific vaccine Petitioner received back to an origin point. *Id.* at 953.

On July 9, 2014, Petitioner visited Dr. Alexander Lee, a gastroenterologist, for his weight loss, bloating, and abdominal pain, and underwent a colonoscopy and endoscopy. Ex. 2 at 893-901. In the provider notes, Dr. Lee noted that Petitioner's "symptoms reportedly started within 1-2 weeks after Tdap vaccine 12/2013." *Id.* at 884. Petitioner was suspected of suffering from POTS, with a slim possibility of IBD. *Id.* at 884-85.

On July 28, 2014, Petitioner underwent a tilt table test for presyncope, which Petitioner reported began in December 2013. Ex. 2 at 995-98. The records note "response to pharmacological tilt: positive." *Id.* at 996.

On July 29, 2014, Petitioner again emailed Dr. Lee, stating "When we spoke after the procedure done on 7/9 I emailed you to ask what will be the next step since the test was normal…."

Ex. 2 at 1047. Petitioner continued to say "you also noted this condition is most likely related to the vaccine I received on December 20, 2013 but you couldn't find the lot # of the vaccine in my records." *Id.*

On August 4, 2014, Petitioner visited Dr. Younessi still complaining of fatigue, loss of balance while walking, and a cold. Ex. 2 at 1074-75. Petitioner underwent an echocardiogram on August 11, 2014, which was largely normal. *Id.* at 1097-99. Petitioner returned on August 29, 2014 stating he still felt dizzy and was unable to walk long distances. *Id.* at 1149-50. Petitioner also inquired if he could get tested for parasites. *Id.* at 1150. Dr. Younessi noted Petitioner's weight loss could be psychosomatic and recommended he be evaluated by the psychiatry department. *Id.*

On September 12, 2014, Petitioner returned to Dr. Lee, where he was diagnosed with irritable bowel syndrome ("IBS") and "non-ulcer dyspepsia." Ex. 2 at 1173.

On September 17, 2014, Petitioner was seen by Dr. Amy Huang, O.D., for an eye examination. Ex. 2 at 1210. Petitioner's medical history stated that "for past 9 months, after trauma to brow area OD w vaccination, both eyes do not seem to focus as well for near." *Id.* Petitioner was diagnosed with Presbyopia. *Id.* at 1212

On September 23, 2014, Petitioner followed up with Dr. Younnesi regarding his September 22, 2014 CT scan which revealed a cyst. Ex. 2 at 1252-58. Petitioner indicated some improvement and his intention to resume work on a part-time basis within the next few weeks. *Id.* at 1257.

On September 29, 2014, Petitioner saw Dr. Younessi for a follow up. Ex. 2 at 1252. Dr. Younessi noted that Petitioner "wonders if the tetanus/whopping cough vaccine caused his symptoms. Has brought literature to show me her[e]." *Id.* The medical records do not contain any notation of whether or not Dr. Younessi supported Petitioner's belief at this time.

On December 3, 2014, Petitioner presented to Dr. Younnesi stating he felt like a "drunken sailor" after walking more than 30 minutes; Petitioner indicated he still felt tired, and that he was experiencing right-sided abdominal pain. Ex. 2 at 1349-51.

On December 19, 2014, Petitioner visited Dr. Nazely Ashikian, a neurologist, regarding his ongoing symptoms. Ex. 2 at 1377-82. Petitioner expressed concern that his symptoms were related to his vaccination last year but Dr. Ashikian stated that was unlikely. *Id.* at 1382. Petitioner's neurological exam was "normal and nonlocalizing." *Id.* Petitioner underwent an electromyogram ("EMG") and nerve conduction study ("NCS") on December 29, 2014. *Id.* at 1429-32. The EMG/NCS revealed evidence of bilateral peroneal neuropathy of unknown etiology and no evidence of peripheral neuropathy, lumbosacral radiculopathy, or myopathy. *Id.* at 1430.

On February 19, 2015, Petitioner returned to Dr. Ashikian with imbalance, weakness, abdominal pain, and fatigue. Ex. 2 at 1467-70. Dr. Ashikian reiterated that his tests were all normal and recommended an antidepressant to see if Petitioner would improve. *Id.* at 1469-70.

On March 2, 2015, Petitioner returned to Dr. Younessi primarily for fatigue, reporting he slept seven hours at night but still woke up feeling exhausted, with disequilibrium. Ex. 1482-85. Dr. Younessi recommended Petitioner undergo a sleep apnea study. *Id.* at 1484. Petitioner took

home equipment for the study on May 6, 2015 and tested negative for obstructive sleep apnea. *Id.* at 1518, 1528.

On May 28, 2015, Petitioner visited Dr. Harvey Negoro for 'intermittent abdominal pains, bloating, loose stools, and constipation." Ex. 2 at 1558-61. Petitioner reported his medications were not helping and he was referred to ENT for evaluation. *Id.* at 1560-61.

On June 12, 2015, Petitioner visited Dr. Brian Worden, an otolaryngologist, for a consultation. Petitioner underwent physical exam that Dr. Worden noted was "reassuringly normal aside from some corrective saccades on head impulse testing." *Id.* at 1583. Dr. Worden recommended Petitioner get a CT scan of his temporal bones and a posturography/MRI of Petitioner's internal auditory canals. *Id.* at 1583. The CT scan was conducted on June 30, 2015 and revealed no significant abnormality. *Id.* at 1606-07.

In August 2015, Petitioner emailed Dr. Younessi seeking a referral to a neuropsychologist after speaking with the mental help line. Ex. 2 at 1743. Dr. Younessi conferred with Dr. Ashikian who believed a referral to a neuropsychiatrist was typically for memory disorders, and did not see the need for Petitioner to see one. *Id.*

On September 25 and October 5, 2015, Petitioner under physical therapy for his disequilibrium. Ex. 2 at 1766-70, 1781-84.

On October 14, 2015, Petitioner had a follow-up appointment with Dr. Younessi. Ex. 2 at 1835-38. Petitioner's abdominal issues were resolved, and his neurological exam was within normal limits. *Id.* at 1836-37.

Petitioner exchanged emails with Dr. Worden on October 26, 2015. Ex. 2 at 1901-05. Dr. Worden informed Petitioner that he should be prepared for the possibility that he will not get a definitive answer regarding his symptoms. *Id.* at 1903. Petitioner inquired whether Dr Worden had considered ataxia or chronic fatigue syndrome ("CFS"), to which Dr. Worden responded,

> Ataxia is a diagnosis that neurologists can make on physical exam. None of the four neurologists you have seen at our medical center noted ataxia when they examined you. Chronic fatigue syndrome is another disorder without available confirmatory tests – it's a diagnosis considered when no other cause of fatigue can be found. This diagnosis would not explain most of your other symptoms, however.

*Id.* Dr. Worden recommended following up with his PCP if he had additional questions regarding chronic fatigue syndrome. *Id.*

On November 4, 2015, Petitioner underwent an auditory canal MRI, which revealed no significant abnormality. Ex. 2 at 1993-94.

On November 23, 2015, Petitioner sent another email to Dr. Younessi asking whether his fatigue was a result of chronic fatigue syndrome, to which Dr. Younessi stated "It is not possible for me to tell you what the origin of your fatigue is." Ex. 2 at 2070.

On March 21, 2016, Petitioner visited Dr. Arbuckle, a neurologist, for his ongoing symptoms of dizziness and fatigue. Ex. 2 at 2296-302. Dr. Arbuckle considered post-concussion syndrome and mal de debarquement but these conditions did not fit Petitioner's presentation. *Id.* at 2301. Dr. Arbuckle agreed to receive links from Petitioner regarding possible additional testing he could receive. *Id.* In an email the following day, Petitioner asked about chronic fatigue syndrome and TGFB1 (transforming growth factor beta 1) and requested a referral to a neuro-ophthalmologist. *Id.* at 2321. Dr. Arbuckle responded that CFS "may be a fitting diagnosis." *Id.* at 2322. On March 24, 2016, Petitioner emailed Dr. Arbuckle for a referral to a "Dr. Amen" to get a functional brain scan since Kaiser Permanente doesn't have those capabilities. *Id.* at 2333. Dr. Arbuckle confirmed Kaiser could not perform Petitioner's requested imaging but also indicated that he could not refer him to Dr. Amen. *Id.* at 2407.

On July 29, 2016, Petitioner returned to Dr. Arbuckle reporting no improvement. Ex. 2 at 2544-48. Dr. Arbuckle suggested another sleep study and another anti-depressant. *Id.* at 2547. Dr. Arbuckle also discussed external referrals Petitioner requested and noted "Many of these facilities are not providing evidence based treatments. While they may not provide harmful therapy, I cannot recommend as there [sic] high quality studies to demonstrate that their treatments are beneficial." *Id.* An electrocardiogram (ECG) performed during this appointment was normal. *Id.* at 2566-70.

On September 15, 2016, Petitioner underwent an auditory evaluation. Ex. 2 at 2623-25. His evaluation revealed no change since his previous exam. *Id.* at 2624.

On October 10, 2016, Petitioner saw Dr. Anh Nguyen-Huynh, a neuro-otologist, for a videonystagmography. Ex. 2 at 2636-41. Dr. Nguyen-Huynh noted that Petitioner

> presents a challenge of diagnosis and management. Despite significant chronic dizziness he has a fairly normal neurotologic exam. The only abnormal finding was atypical and aphysiologic responses in the Romberg test. This finding mirrors his computerized dynamic posturography in 2015 where he demonstrated maladaptive responses to balance challenges… I tell the patient frankly that I do not know the cause of his disequilibrium and gait abnormality. He does not appear to have any "hardware issues." His dizziness might be caused by a "software malfunction" in the CNS although I do not know how to identify the problem or how to alleviate it.

*Id.* at 2639. Dr. Nguyen-Huynh recommended Petitioner return to Dr. Arbuckle for "any trial of medication." *Id.*

On November 15, 2016, Dr. Arbuckle spoke with Petitioner on the phone and encouraged him to get a sleep study. Ex. 2 at 2675. Dr. Arbuckle informed Petitioner he did not know of any other subspecialities to refer him to and noted chronic fatigue syndrome and chronic subjective dizziness were possible diagnoses. *Id.*

On August 22, 2017, Petitioner met with Fariba Beik, a social worker, for mental health management. Ex. 14 at 152.

On September 11, 2017, Petitioner saw Dr. Donald Eknoyan for a psychiatric evaluation. Ex. 14 at 182-87. Dr. Eknoyan noted that Petitioner had ongoing symptoms of anxiety, fatigue,

worsening dizziness, disequilibrium since December 2013 when he got a tetanus shot after laceration from a fall. *Id.* at 186. Dr. Eknoyan recommended continued therapy and an SSRI, however Petitioner did not want to start psychiatric medication. *Id.* at 187.

On November 6, 2017, Petitioner saw Dr. Rashmi Nadig, a rheumatologist, with a four-year history of "slowly progressive muscle pains, muscle weakness, chronic fatigue. Having difficulty walking now. Felt it was precipitated by vaccination, patient query regarding macrophagic myofasciitis'?" Ex. 14 at 511-15. Dr. Nadig noted that macrophagic myofasciitis "has been reported in association with alum containing vaccines-this is not a disorder managed/treated by rheumatology. Neither patient history nor examination today are suggesting of a systemic connective tissue disease at this time- patient informed of the same." *Id.* at 515.

On December 22, 2017, Petitioner emailed his PCP, Dr. Younessi, stating he had asked Dr. Arbuckle for a deltoid biopsy but that Dr. Arbuckle was hesitant to order it. Petitioner was requesting the biopsy "to find if the presence of aluminum in [his] deltoid muscle is macrophagic myofasciitis related and the cause of my chronic fatigue." Ex. 14 at 1077.

## III.    Affidavits

### A.  Petitioner's Affidavit

 Petitioner filed an affidavit on August 23, 2017. ECF No. 19. Petitioner provided a detailed history of his medical appointments between December 20, 2013 and November 15, 2016. Petitioner listed psychotherapy, acupuncture, and chiropractic sessions and treatments he has had since his symptoms developed. *See* Pet. Aff. at 15-22, ECF No. 19.

### B.  Affidavit of Dr. Elena Gabor, friend of Petitioner

Dr. Gabor has known Petitioner since 2012. ECF No. 13-1. Dr. Gabor is a "life coach and hypnotherapist." *Id.* at 1. Dr. Gabor learned of Petitioner's condition in March 2014 and sent him her "professional guided meditation recordings for [Petitioner] to relax." *Id.* Dr. Gabor spent time on the phone with Petitioner to coach and support him. *Id.* When Dr. Gabor was able to see Petitioner in person, she was "shocked" to see how much weight he had lost and how frail he looked. *Id.* He was reliant on others to transport him to medical appointments and to get him food. *Id.*

Dr. Gabor's "observations as a U.S. hypnotherapist and personal development coach and former D.M.D. (with European license)"[3] was that Petitioner was experiencing the following symptoms:

> Headaches, anxiety sadness, stress, dizziness, fatigue, severe muscle and weight loss, stomach, joint and muscle pain, lightheadedness, nausea, excess sleepiness, weakness in his arms, legs, hands, muscle and overall body motion sickness, discomfort and motion sensitivity that he describes as "walking like on a rubber floor.

---

[3] Dr. Gabor is not a medical doctor and did not observe Petitioner in a clinical setting.

ECF No. 13-1 at 2. Petitioner stays home and avoids socialization as a consequence of his condition. *Id.*

### C.  Affidavit of Vaclav Havlik, friend of Petitioner

Mr. Havlik met Petitioner in 2008 through a mutual friend. ECF No. 13-2 at 1. Mr. Havlik remembers Petitioner's fall and subsequent trip to the ER. *Id.* Mr. Havlik brought Petitioner groceries and drove him to his doctor's appointments. *Id.* Mr. Havlik attended one of Petitioner's doctor appointment and recalled Dr. Lee telling Petitioner that his symptoms were "the result of a severe vaccine reaction" . *Id.* at 1-2. Dr. Lee also told Petitioner that there was no test to verify his condition other than one done postmortem. *Id.* at 2.

Mr. Havlik stated that his "non-medical trained opinion" was that Petitioner suffered from:

> Headaches, fatigue, malaise, racing heart, anxiety, depression , stress, dizziness, blurred vision, severe muscle and weight loss, stomach pain and discomfort, muscle weakness and pain, joint pain, lightheadedness, nausea, excess sleepiness and exhaustion from just a light physical activity, weakness and numbness in his arms, legs, hangs, and overall body. He also suffered from motion sickness.

*Id.* Mr. Havlik also observed that Petitioner was more withdrawn and stayed at home as a result of his condition. *Id.*

## IV.   Expert Reports

### A.  Petitioner's Expert: Dr. Ava Stanczak

Dr. Ava Stanczak received a doctor of osteopathy (D.O.) degree from the Texas College of Osteopathic Medicine. Ex. 21 at 1. She is board certified in osteopathic pediatrics and urgent care medicine. *Id.*

Dr. Stanczak submitted a three-page expert report. Ex. 15. In this report, Dr. Stanczak noted that Petitioner completed a muscle biopsy for macrophagic myofasciitis ("MMF"), which was negative. *Id.* at 1. Dr Stanczak then stated that MMF has been linked with chronic fatigue syndrome and a patient in a case study had symptoms "identical to Mr. Kos." *Id.* at 2. Dr. Stanczak stated that "vaccines implicated in MMF and in CFS include [the] Hepatitis B vaccine, hepatitis A vaccine, vaccine for human papilloma virus and tetanus vaccines," and that the vaccines contain aluminum as an adjuvant. *Id.* Dr. Stanczak indicated that Petitioner "received all of his primary vaccines as a child in Czechoslovakia which would have possibly included tetanus vaccines and hepatitis B." *Id.*

Regarding the theory of causation, Dr. Stanczak opined that both MMF and CFS were strongly linked to autoimmune syndrome induced by adjuvants  ("ASIA"). Ex. 15 at 2. Symptoms of ASIA include "extreme fatigue, arthritis, and myalgia, neurologic manifestations which include cognitive impairment, dizziness, poor concentration and poor sleep," and "all of these symptoms have been reported by Mr. Kos." *Id.* Dr. Stanczak opined that Petitioner received a diagnosis of

CFS from his PCP and that his current comorbid diagnoses of dysthymia and depression could be a manifestation of either MMF or CFS. *Id.* Dr. Stanczak's opinion, with reasonable medical certainty, is that Mr. Kos has CFS and ASIA from the December 20, 2013 Tdap vaccination, even though his evaluation does not currently support a diagnosis of MMF, future biopsies could reveal MMF. *Id.* at 3.

### B. Respondent's Expert: Dr. J. Lindsay Whitton

Dr. J. Lindsay Whitton received M.B. (equivalent to the American M.D. degree), Ch.B. and Ph.D. degrees from the University of Glasgow, Scotland. Ex. B at 1. Dr. Whitton has taught at the Scripps Research Institute since 1986, and is currently a Professor for the Department of Immunology and Microbiology. *Id.* Dr. Whitton is a member of the American Association of Pathologists, American Association of Immunologists, American Society of Virology, and American Society of Microbiology. *Id.* Dr. Whitton is a reviewer and member of the editorial boards for a number for publications including (but not limited to) the Journal of Virology, Molecular Therapy, and Journal of Biological Chemistry. *Id.* Dr. Whitton has published nearly 200 peer-reviewed papers, as of 2017. *Id.* at 2-15.

Respondent filed Dr. Whitton's white paper from 2014 regarding Dr. Yehuda Schoenfeld's ASIA theory, titled "Review of the ASIA hypothesis". Ex. A. Versions of this paper have been submitted in other Vaccine Program cases and have been cited in numerous decisions, maintaining this theory as unsupported by scientific evidence. *See id.* at 16; *see also, e.g.*, *Mitchell v. Sec'y of Health & Hum. Servs.*, No. 13-948V, 2017 WL 3816078 (Fed. Cl. Spec. Mstr. Aug. 7, 2017); *Johnson v. Sec'y of Health & Hum. Servs.*, No. 10-578V, 2016 WL 4917548 (Fed. Cl. Spec. Mstr. Aug. 18, 2016); *Garner v. Sec'y of Health & Hum. Servs.*, No. 15–063V, 2017 WL 1713184, at *8 (Fed. Cl. Spec. Mstr. Mar. 24, 2017) (observing that the ASIA theory "is, at a minimum, incomplete and preliminary—and therefore unreliable from an evidentiary standpoint"); *Morris v. Sec'y of Health & Hum. Servs.,* No. 12-415V, 2016 WL 3022141 (Fed. Cl. Spec. Mstr. Apr. 1, 2016); *Rowan v. Sec'y of Health & Hum. Servs.*, No. 10-272V; 2015 WL 3562409 (Fed. Cl. May 18, 2015), *aff'd* No. 10-272V, 2015 WL 3563409 (Fed. Cir. 2015); *Harris v. Sec'y of Health & Hum. Servs.*, No. 10-322V, 2014 WL 3159377 (Fed. Cl. Spec. Mstr. June 10, 2014); *D'Angiolini v. Sec'y of Health & Hum. Servs.*, No. 99-578V, 2014 WL 61678145 (Fed. Cl. Spec. Mstr. Mar. 27, 2014).

### V.   Parties' Arguments

Respondent argued that Petitioner has failed to establish a reasonable basis for his claim and therefore should not be awarded fees and costs. Fees Resp. Specifically, Respondent stated "the filed medical records fail to support petitioner's apparent alleged vaccine injury of chronic fatigue syndrome and/or MMF. Additionally, petitioner has provided no evidence of reputable causation theory or addressed what a medically appropriate timeframe for vaccine injury would be under his theory." *Id.* at 10-11.

Respondent noted that ASIA has been a theory of vaccine causation explored in numerous cases in the Vaccine Program and has been routinely rejected. *Id.* Petitioner also alleged a Table injury, but had not clearly defined what Table injury was alleged. *Id.* Although Petitioner filed an expert report from Dr. Stanczak in which she opined that Petitioner had chronic fatigue syndrome

induced by adjuvants (ASIA), Dr. Stanczak's training and practice are in pediatrics; she has no specific expertise in immunology.

Respondent argued that Dr. Stanczak's report lacked persuasiveness because Petitioner failed to demonstrate that he had macrophagic myofasciitis ("MMF"), a key component to Dr. Stanczak's ASIA theory. Petitioner was also not diagnosed with chronic fatigue syndrome, as Dr. Stanczak claimed in her report. Fees Resp. at 2-3.

In response to Respondent's motion, Petitioner argued that he had a reasonable basis to file his claim because, in addition to his alleged Table injury, Petitioner also alleged that his symptoms were caused-in-fact by the Tdap vaccine. Fees Reply at 2-3; *see also* Pet. at 4. Petitioner noted that he filed medical records, medical literature, and an expert report in support of his case. Petitioner also claimed that he corresponded with other experts, including Dr. R. K. Gherardi, "who is a leading researcher in the area of a link between Chronic fatigue syndrome and vaccines," and cited medical literature authored by Dr. Gherardi in the record. Fees Reply at 3. Petitioner further stated that he believed my willingness to give him additional time to find another expert to opine regarding another theory of causation was an indication that I believed there was merit to this case. *See id.* at 11.

## VI. Legal Standard

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is presumed where a petition for compensation is granted. Where compensation is denied, or a petition is dismissed, as it was in this case, the special master must determine whether the petition was brought in good faith and whether the claim had a reasonable basis. § 15(e)(1).

### A. Good Faith

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Hum. Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such a requirement is a "subjective standard that focuses upon whether [P]etitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioner had an honest belief that her claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

### B. Reasonable Basis

Unlike the good-faith inquiry, an analysis of reasonable basis requires more than just a petitioner's belief in her claim. *Turner*, 2007 WL 4410030, at *6-7. Instead, the claim must at least be supported by objective evidence -- medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Hum. Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015).

While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. United States,* 116 Fed. Cl. 276, 283 (2014). The Court of Federal Claims affirmed in *Chuisano* that "[a]t the most basic level, a petitioner who submits no evidence would not be found to have reasonable basis…." *Id.* at 286. The Court in *Chuisano* found that a petition which relies on temporal proximity and a petitioner's affidavit is not sufficient to establish reasonable basis. *Id.* at 290; *see also Turpin v. Sec'y Health & Hum. Servs.*, No. 99-564V, 2005 WL 1026714, *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005) (finding no reasonable basis when petitioner submitted an affidavit and no other records); *Brown v. Sec'y Health & Hum. Servs.*, No. 99-539V, 2005 WL 1026713, *2 (Fed. Cl. Spec. Mstr. Mar. 11, 2005) (finding no reasonable basis when petitioner presented only e-mails between her and her attorney). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 2019-1596, 971 F.3d 1337, 1346 (Fed. Cir. Aug. 19, 2020) (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert); *see also James-Cornelius v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021) (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis.").

The Federal Circuit has noted that determining what constitutes "more than a mere scintilla" is a "daunting task." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 15-1291V, 2021 U.S. Claims LEXIS 1437 at *13 (Fed. Cir. July 6, 2021). Citing the Fourth Circuit's ruling in *Sedar v. Reston Town Ctr. Prop., LLC*, the Federal Circuit has characterized "more than a mere scintilla" as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham*, 2021 U.S. Claims LEXIS 1437 at *13, *citing Sedar v. Reston Town Ctr. Prop., LLC* (988 F.3d 756, 761 n.3 (4th Cir. 2021); *see also Kurtz v. Fels*, 63 Wash. 2d 871, 878 (Wash. 1964) (holding that proof beyond a mere scintilla requires "facts to be assessed by the senses" and something "tactile" rather than calculations); *Gibson v. Epting*, 426 S.C. 346, 352 (S.C. 2019) (describing scintilla as a "perceptible amount" and "not something conjured up by the shadows.").

Temporal proximity between vaccination and onset of symptoms is a necessary component in establishing causation in non-Table cases, but without more, temporal proximity alone "fails to establish a reasonable basis for a vaccine claim." *Chuisano*, 116 Fed. Cl. at 291.

The Federal Circuit has stated that reasonable basis "is an objective inquiry" and concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017). Further, an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis. "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa v. Sec'y of Health & Hum. Servs.*, 138 Fed. Cl. 282, 289 (2018).

"[I]n deciding reasonable basis the [s]pecial [m]aster needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery." *Santacroce v. Sec'y of Health & Hum. Servs.*, No.

15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018). Special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). A Petitioner need not provide medical or expert opinion on causation to show reasonable basis for her claim. *Cottingham*, 2021 U.S. Claims LEXIS 1437 at *19. While a Special Master may consider the absence of relevant medical opinion as a factor in determining whether a claim had reasonable basis, such absence is not dispositive of the issue. *Id.* at *16.

When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa*, 138 Fed. Cl. at 289. This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

### C.  Attorneys' Fees and Costs

The Vaccine Act permits reimbursement of "reasonable" attorneys' fees and costs. § 15(e)(1). Special masters have "wide latitude in determining the reasonableness of both attorneys' fees and costs." *Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991). The Federal Circuit has endorsed the use of the lodestar approach, in which a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1347-48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). The court may then make an upward or downward departure from the initial calculation based on other specific findings. *Id*. at 1348. Although not explicitly stated in the statute, attorneys' costs are also subject to a reasonableness requirement. *See Perreira*, 27 Fed. Cl. 29 at 34.

Petitioner bears the burden of establishing that the rates charged, hours expended, and costs incurred are reasonable. *Wasson v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 482, 484 (1993). However, special masters may reduce awards *sua sponte*, independent of enumerated objections from the respondent. *Sabella v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 201, 208-09 (Fed. Cl. 2009); *Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 318 (Fed. Cl. 2008), *aff'd* No. 99-573V, 2008 WL 2066611 (Fed. Cl. Spec. Mstr. Apr. 22, 2008). A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 729 (Fed. Cl. 2011). Special masters may look to their experience and judgment to reduce an award of fees and costs to a level they find reasonable for the work performed. *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521 (Fed. Cl. 1993). It is within a special master's discretion to instead make a global reduction to the total amount of fees requested. See *Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991) ("special masters have "wide latitude in determining the reasonableness of both attorneys' fees and costs"); *Hocraffer v. Sec'y of Health & Hum. Servs.*, No. 99-533V, 2011 WL 3705153 (Fed. Cl. Spec. Mstr. July 25, 2011), mot. for rev. denied, 2011 WL 6292218, at *13 (Fed. Cl. 2011) (denying review of the special master's decision and endorsing "a global – rather than line-by-line – approach to determine the reasonable number of hours expended in this case").

## VII.   Discussion

### A.  Good Faith

Petitioner is entitled to a presumption of good faith. *See Grice*, 36 Fed. Cl. 114 at 121. Respondent does not challenge Petitioner's good faith. *See* Fees Resp. at 6. Based on my own review of the case, I find that Petitioner acted in good faith when filing this petition.

### B.  Reasonable Basis

Petitioner's medical records demonstrate that he suffered a series of symptoms shortly after receiving the Tdap vaccine on December 20, 2013. There is evidence that Petitioner may have had a reaction to the vaccine, as he reported experiencing pain at the injection site five days after vaccination in his December 30, 2013 email to Dr. Younessi. Ex. 2 at 201. In this email, he also noted that he was "tired with no energy, exhausted." Ex. 2 at 201. Petitioner further wrote "Thought I get some improvement since it had been 5 days but no. Is this normal reaction after the Tdap?" *Id.* While Dr. Younessi was unavailable, RN Irene Hart responded to Petitioner that his symptoms were normal side-effects of the Tdap vaccine. *Id.* at 212. On January 2, 2014, Petitioner sent another email to Dr. Younessi stating "Still not much more energy even after getting much rest." *Id.* at 206. Petitioner continued sending Dr. Younessi emails in January 2014, noting nausea, low energy, weakness, and muscle spasms, and requested notes to be excused from work. *Id.* at 202-300.

On July 3, 2014, Petitioner sent an email to Dr. Lee stating, in part, that Dr. Lee had "mentioned that my current condition may be caused by the administration of the vaccine Adacel which I received on December 20[th][, 2013]." Ex. 2 at 871.

On November 23, 2015, Petitioner sent another email to Dr. Younessi asking whether his fatigue was a result of chronic fatigue syndrome. Ex. 2 at 2070.

On March 21, 2016, Petitioner visited Dr. Arbuckle, a neurologist, for his ongoing symptoms of dizziness and fatigue. Ex. 2 at 2296-302. In an email the following day, Petitioner asked about chronic fatigue syndrome. *Id.* at 2321. Dr. Arbuckle responded that CFS "may be a fitting diagnosis." *Id.* at 2322.

On November 15, 2016, Petitioner presented to Dr. Arbuckle for dizziness and fatigue. Ex. 2 at 2675. Dr. Arbuckle noted that "Chronic fatigue syndrome and chronic subjective dizziness are possible diagnoses." *Id.*

In addition to these notations in the medical records, Petitioner also filed an expert report from Dr. Ava Stanczak, an osteopathic doctor. Ex. 15. Although Dr. Stanczak is not a neurologist, immunologist, or rheumatologist, she did receive medical training and is board certified in osteopathic pediatrics and urgent care. Ex. 21 at 1. Dr. Stanczak has also taught pediatrics at a number of osteopathic medical schools such as the Lincoln Memorial University-DeBusk College of Osteopathic Medicine, University of Texas Medical Branch at Galveston, and the University of Texas Southwestern Medical School at Dallas. Ex. 21 at 1-2.

In her expert report, Dr. Stanczak opined that Petitioner developed CFS and/or ASIA as a result of his Tdap vaccine. Ex. 15 at 3. She cited medical literature in support of her opinion. *See What is ASIA? An Interview with Yehuda Shoenfeld*, 11 BMC MEDICINE 118 (2013); Exley et al., *The role for the body burden of aluminum in vaccine-associated macrophagic myofasciitis and chronic fatigue syndrome*, 72 MEDICAL HYPOTHESES 2 (2009). Dr. Stanczak's expert report is certainly not persuasive. As I mentioned during two different status conferences in the case, the ASIA theory has been repeatedly rejected in the Vaccine Program. However, the standard I must apply in this matter is not whether the evidence is persuasive, but whether Petitioner has presented more than a mere scintilla of evidence in support of his theory. I find that he has.

In order to find that Petitioner did not establish a reasonable basis to support his claim, I would need to find that Dr. Stanczak's report did not amount to a more than a mere scintilla of evidence. I am not prepared to make such a finding. While Dr. Whitton was persuasive in articulating that ASIA is not a viable causation theory, this is still an issue that I would necessarily have weighed at either an entitlement hearing or during a ruling on the record, had Petitioner not dismissed his claim. Petitioner has documented fatigue and flu-like symptoms in his medical records shortly after his receipt of the Tdap vaccine, and has provided an expert opinion indicating that he suffered from CFS as a result of his vaccination. In addition, upon describing his symptoms, Petitioner was told by the attending RN that his symptoms were a side effect of the Tdap vaccine. Although his treating physicians did not definitively diagnose him with CFS, Dr. Arbuckle noted that CFS "may be a fitting diagnosis." Based on the above, I find Petitioner has established a reasonable basis to support his claim.

## VIII.   Attorneys' Fees and Costs

Petitioner requests a total of $122,593.26 in attorneys' fees and costs. Fees App., ECF No. 84. This includes $116,108.75 in attorneys' fees and $6,484.51 in attorneys' costs, which consist of copies, postage, and Dr. Stanczak's expert report. Fees App. at 3.

### A.   Reasonable Hourly Rate

A reasonable hourly rate is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11).  In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of [P]etitioner's attorney." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349).

*McCulloch* provides the framework for determining the appropriate compensation for attorneys' fees based upon the attorneys' experience.  *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[4]

---

[4] The 2015–2016 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule2015-2016.pdf.
The 2017 Fee Schedule can be accessed at:

Petitioner's attorney, Mr. Brian Arnold requests to be compensated at an hourly rate of $450.00 for 2016-2017, $455.00 for 2018, $460.00 for 2019, and $475.00 for 2020. Mr. Arnold has been a licensed attorney since 1983 and has been admitted to practice in the U.S. Court of Federal Claims since 1989. *See* Arnold Affidavit at 2, ECF No. 84-2. Mr. Arnold practices in the Dallas-Fort Worth area. *See id.* at 1. Mr. Arnold was last awarded attorneys' fees in 2017 in *De'* and *Theriot*. In *De'*, Mr. Arnold was compensated at an hourly rate of $295.00/hour for work performed in 2012-2015. *De' v. Sec'y of Health & Hum. Servs.*, No. 14-190V, 2017 WL 6949728 (Fed. Cl. Spec. Mstr. Dec. 14, 2017). In *Theriot,* Special Master Sanders granted Mr. Arnold's requested fees and costs in full, but did not discuss whether Mr. Arnold's hourly rate was reasonable. *See Theriot v. Sec'y of Health & Hum. Servs.*, No. 13-778V, 2017 WL 5988047 (Fed. Cl. Spec. Mstr. Nov. 7, 2017) at fn. 3. Notable in the *Theriot* case, Mr. Arnold requested an hourly rate of $325.00 for work performed in 2016-2017. Mr. Arnold has not provided any reasoning as to why he increased his hourly rate by $125.00 for those years, only that he requested rates "adhere to the schedule of ranges of fees adopted by the Court set forth in *McCulloch*." Arnold Aff. at 3, ECF No. 84-2.

Mr. Arnold is incorrect in stating that his requested hourly rates are in line with *McCulloch*. *McCulloch* sets hourly rates for attorneys with ranges of years of experience in practice. In 2016, the first year Mr. Arnold began working on this case, he had approximately 27 years of experience in the Vaccine Program, therefore he does not qualify for the top range of attorney hourly rates (31+ years of experience in Vaccine Program practice). Mr. Arnold's requested hourly rate of $450.00/hour for 2016-17 is well above the *McCulloch* rates for his years of experience. The table below shows Mr. Arnold's requested hourly rates and the appropriate range of rates from the OSM Fee Schedule based on Mr. Arnold's years of experience in the Vaccine Program.

| Year | Requested Hourly Rate | OSM Fee Schedule Range |
|------|-----------------------|------------------------|
| 2016 | $450 | $350-$415 (20-30 years of experience) |
| 2017 | $450 | $358-$424 (20-30 years of experience) |
| 2018 | $455 | $370-$455 (20-30 years of experience) |
| 2019 | $460 | $378-$448 (20-30 years of experience) |
| 2020 | $475 | $433-$484 (31+ years of experience) |

Mr. Arnold's requested hourly rates are well above the OSM Fee Schedule ranges in 2016-2019;

---

http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2017.pdf.
The 2018 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202018.pdf.
The 2019 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202019.pdf.
The 2020 Fee Schedule can be accessed at:
http://www.uscfc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202020.PPI_OL.pdf
The hourly rates contained within the schedules are updated from the decision in McCulloch, 2015 WL 5634323.

additionally, he has not demonstrated why he deserves an hourly rate on the high end of his appropriate experience range for 2020.

Furthermore, Mr. Arnold should not be compensated at his requested rates given the work performed. Although I have found that Petitioner filed this case with reasonable basis, Mr. Arnold was repeatedly cautioned that the ASIA theory was one unsupported in the Vaccine Program, as early as April 2018, in Respondent's Rule 4(c) Report. *See* Resp't's Rep. at 10, ECF No. 39. Mr. Arnold ignored Respondent's position and filed an expert report from Dr. Stanczak proposing ASIA as a theory of causation. I articulated my belief in the nonviability of Petitioner's theory during a status conference in December 2019. *See* Scheduling Order dated 12/4/2019, ECF No. 59. I reiterated my position in a status conference with the parties on March 31, 2020, after the parties filed briefs regarding Respondent's Motion for an Order to Show Cause. *See* Scheduling Order on 4/2/2020, ECF No. 72. This case continued for another six months during which time Petitioner did not file additional evidence or provide another expert report.

It also is not clear that Mr. Arnold appreciated the difference between a Table injury and a non-Table injury. In the petition,[5] Petitioner alleged that "his injuries fall squarely within the Vaccine Injury Table." Pet. at 3. In his Rule 4(c) Report, Respondent contended that the record of this case does not support any of Table injuries associated with the Tdap vaccine. Resp't's Rep. at 11. In Petitioner's response to Respondent's Motion for Order to Show Cause, Mr. Arnold again argued that Petitioner's symptoms "began within the time frame on the vaccine injury table of 2-28 days," and "[Petitioner's] scenario fits into Sections I(c) and II(c) of the Vaccine Injury Table." ECF No. 64-1 at 2. Sections I(c) and II(c) of the Table in effect at that time provided that a covered illness, disability, injury, or condition included "Any acute complication or sequela (including death) of an illness, disability, injury, or condition referred to above which illness, disability, injury, or condition arose within the time period prescribed". It is unclear to which "condition referred to above" Mr. Arnold was referencing. Assuming it was brachial neuritis, that diagnosis is not supported in this case, nor is this injury alleged in the Petition. Mr. Arnold in fact later conceded that Petitioner was not alleging a Table injury. *See* Scheduling Order dated 4/2/2020, ECF No. 72. Mr. Arnold stated that Petitioner "experienced symptoms that resembled brachial neuritis… [but] turned into something else and is therefore not alleging a Table Injury." *Id.* This clarification was made nearly four years into the litigation of this case.

Finally, Mr. Arnold's filings were poorly organized. As an example, Mr. Arnold filed Petitioner's expert report and all cited medical literature as one document. Each cited article of literature should have been labeled and individually filed for accessibility and compliance with the Vaccine Rules. *See* ECF Nos. 67-71, Exs. A01-A37, Exs. C-F. Mr. Arnold repeated this mistake in Petitioner's Response to Respondent's Motion to Show Cause. *See* ECF No. 64 (a 90-page document, which consists of nine pages as Petitioner's response and 81 pages of medical literature with an improper naming convention (labeled as Exhibits 1-4, even though Petitioner had already submitted exhibits with the same label)).

Based on the work performed, I will make an adjustment to Mr. Arnold's rate and award him the lowest end of the *McCulloch* range that correlates with his years of experience in the

---

[5] Petitioner does not identify any specific diagnosis or injury in his Petition; rather, he lists his numerous symptoms.

Vaccine Program: an hourly rate of $350.00 for 2016; $358.00 for 2017; $370.00 for 2018; $378.00 for 2019; and $433.00 for 2020.

Petitioner also requests a paralegal hourly rate of $150.00 per hour for work performed from 2016-2020. Mr. Arnold's paralegal rate was $125.00 for 2016-2017. *See Theriot v. Sec'y of Health & Hum. Servs.*, No. 13-778V, 2017 WL 5988047 (Fed. Cl. Spec. Mstr. Nov. 7, 2017). Mr. Arnold has not provided reasoning as to why there was an increase of $25.00. Similar to Mr. Arnold's attorney hourly rates, I shall award the minimum paralegal hourly rate delineated by *McCulloch*: $125.00 for 2016; $128.00 for 2017; $132.00 for 2018; $135.00 for 2019; $141.00 for 2020.

### B. Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1522 (Fed. Cir. 1993). In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 728-29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction of attorney and paralegal hours). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g., McCulloch*, 2015 WL 5634323, at *26.

Petitioner's counsel has provided a breakdown of hours billed. Fees App., Ex. A. I find the hours billed to be excessive for what appears to be administrative tasks[6] and for collecting and reviewing medical records. Mr. Arnold has been reduced for these practices before. *See Tieu Binh Le v. Sec'y of Health & Hum. Servs.*, No. 07-895V, 2014 WL 4177331 (Fed. Cl. Spec. Mstr. Jul. 31, 2014) (reducing Mr. Arnold's hours for administrative tasks; preparing status reports; and collecting, reviewing, and filing medical records). Of the roughly 300[7] hours billed by Mr. Arnold at his requested attorney and paralegal rates, over 60 of those hours were dedicated to these tasks. These practices were consistent throughout the years of litigation.

Mr. Arnold has also overbilled for a number of tasks. Mr. Arnold spent over 20 hours reviewing medical records. The medical records in this case are voluminous but are relatively straightforward regarding the consistency of Petitioner's symptoms, testing, and treatment. Mr. Arnold also spent a number of hours preparing letters and packages for doctors. These entries were excessive and billed at both attorney and paralegal rates.

---

[6] Some of these administrative tasks include items such as: "Prepare Notice of Filing," "Prepare new Table of Contents," "Scan, upload and file with Court," "Burn CDs".

[7] The total number of attorney and paralegal hours billed is 315.45 hours however, there were a number of billing entries that had "no charge" but contributed to the hourly total.

Most importantly, for a case that was dismissed at a relatively early stage in the litigation process, I find that 300 hours *far exceeds* the number of hours typically billed in a comparable proceeding. As such I find that 300 hours is unreasonably high. While this amount of time may well be appropriate in a case that involved a hearing, it is not appropriate herein. For example, in *Antalosky v. Sec'y of Health & Hum. Servs.*, No. 16-701V, 2022 WL 363916 (Fed. Cl. Spec. Mstr. Jan. 24, 2022), I granted interim fees and costs for 300+ attorney hours and 20+ paralegal hours in a case that involved an entitlement hearing and six expert reports. It is clear to me that a significant number of hours in the case at bar were dedicated to purely administrative tasks, (which are uncompensated in the Program), as well as for collecting and reviewing medical records. Accordingly, I shall reduce Petitioner's requested hours by 50%. Based on my experience in reviewing similarly situated cases, I find that a 50% reduction is appropriate both to correct for improper billing, and to reduce the hours billed to reflect the complexity of the case. Other special masters have applied similar reductions when appropriate.[8]

| Year | Hours Billed | Adjusted Hourly Rate | Total Awarded |
|------|--------------|----------------------|---------------|
| 2016 | 30.2 hours (22.3 attorney hours; 7.9 paralegal hours) | $350/hour (attorney) $125/hour (paralegal) | $8,792.50 |
| 2017 | 94.8 hours (58.85 attorney hours; 35.95 paralegal hours) | $358/hour (attorney) $128/hour (paralegal) | $25,669.90 |
| 2018 | 56.35 hours (40.85 attorney hours; 15.5 paralegal hours) | $370/hour (attorney) $132/hour (paralegal) | $17,160.50 |
| 2019 | 50.05 hours (40.2 attorney hours; 9.85 paralegal hours) | $378/hour (attorney) $135/hour (paralegal) | $16,525.35 |
| 2020 | 76.9 hours (64.4 attorney hours; 12.5 paralegal hours) | $433/hour (attorney) $141/hour (paralegal) | $29,647.70 |

Total: $97,795.95 x 50% deduction for administrative tasks and overbilling = $48,897.98

Total attorneys' fees to be awarded: **$48,897.98.**

### C. Reasonable Costs

Petitioner requests $6,484.51 for the Court's filing fee, postage, copies, medical records, PACER fees, and Dr. Ava Stanczak's expert report. ECF No. 84-1 at 48-52.

#### 1. Petitioner's Expert Costs

---

[8] Then-Chief Special Master Dorsey reduced Petitioner's application for final fees and costs, a total of $731,251.40, to $368,953.81 for high attorney hourly rates and various other poor billing practices. *Raymo v. Sec'y of Health & Hum. Servs.*, No. 11-654V, 2016 WL 7212323 (Fed. Cl. Spec. Mstr. Nov. 2, 2016) (mot. for rev. denied, 129 Fed. Cl. 691 (2016) (approving the chief special master's reduction of one firm's fees by twenty percent and a second firm's fees by forty percent)). Special Master Gowen applied a 50% reduction to petitioner's total fee request to "achieve a reasonable result." *Dasilva v. Sec'y of Health & Hum. Servs.*, No. 18-1282V, 2020 WL 6705551 (Fed. Cl. Spec. Mstr. Oct. 23, 2020).

Petitioner requests $5,000.00 for work performed by Dr. Ava Stanczak. Fees App., Ex. C, ECF No. 84-3. Dr. Stanczak provided a letter summarizing her work in this case, which totaled 40 hours for "research, records review, letter writing and conferences" over three years. *Id.* Dr. Stanczak states that her hourly rate for "research and review" is $125.00. *Id.* Attorneys' costs are subject to the same reasonableness requirements as attorneys' fees. *See, e.g.*, *Apuzzo v. Sec'y of Health & Hum. Servs.*, No. 17-1915V, 2021 WL 4305223 (Fed. Cl. Spec. Mstr. Aug. 23, 2021). Block billing is clearly disfavored in the program. *See, e.g., Castaneda v. Sec'y of Health & Hum. Servs.*, No. 15-1066V, 2018 WL 9457462 (Fed. Cl. Spec. Mstr. Jun. 21, 2018). Indeed, the Vaccine Program's Guidelines for Practice state as follows: "[e]ach task should have its own line entry indicating the amount of time spent on that task. Lumping together several unrelated tasks in the same time entry frustrates the court's ability to assess the reasonableness of the request." *Id.*

I normally do not allow for block billing by experts. *See Stuart v. Sec'y of Health & Hum. Servs.,* No. 16-940V, 2022 WL 176145 (Fed. Cl. Spec. Mstr. Jan. 5, 2022). However, as this is a final motion for attorneys' fees and costs and neither the hours expended nor the requested hourly rate seems unreasonable, I will award Dr. Stanczak's costs in full. Petitioner's counsel is warned that such practices are not allowed in the Vaccine Program and bills submitted with insufficient detail will not be awarded in the future.

## 2. Miscellaneous Costs

I have reviewed all miscellaneous costs for which compensation is requested and the supporting documentation. These costs include the Court's filing fee ($400.00), PACER, copies, and postage. Because Petitioner's requested miscellaneous costs are reasonable, I award them in full.

Total costs to be awarded: **$6,484.51.**

## IX.    Conclusion

Accordingly, in the exercise of the discretion afforded to me in determining the propriety of fee and cost awards, and based on the foregoing, I **GRANT IN PART** Petitioner's application, as follows:

A lump sum in the amount of **$55,382.49**, representing reimbursement of Petitioner's final attorneys' fees and costs in the form of a check jointly payable to Petitioner and his attorney, Mr. Brian Arnold.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with this decision.[9]

**IT IS SO ORDERED.**

**s/ Katherine E. Oler**

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.

21

Katherine E. Oler
Special Master